**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

**CIVIL ACTION NO. 09-135-JBC**

**ASHLAND INC., ET AL.,**                                                                              **PLAINTIFFS,**

**V.**                                     **MEMORANDUM OPINION AND ORDER**

**OPPENHEIMER & CO., INC.,**                                                             **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the defendant's motion to dismiss.  R. 40,

41.  For the reasons discussed below, the court will grant the motion.

**I.      Background**

The plaintiffs, Ashland Inc. and AshThree LLC (collectively referred to as

"Ashland"), sued the defendant, Oppenheimer Inc. ("Oppenheimer"), alleging that

Oppenheimer made false and misleading statements and material omissions aimed

at inducing Ashland to hold and to continue to purchase "auction rate securities"

(ARS) at a time when Oppenheimer knew the market for those securities was

collapsing.  Compl. ¶1.  Ashland's claims include fraud in violation of Section 10(b)

of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated

thereunder, fraud in violation of K.R.S. 292.320 and 292.480, common-law fraud,

promissory estoppel, and negligent misrepresentation.  *Id.* at ¶89-119.

**A.      ARS**

1

In or around May 2007, Ashland engaged Oppenheimer to provide investment and cash-management services.  Compl. ¶27.  Beginning in June 2007, based on representations by Oppenheimer, Ashland began purchasing Oppenheimer-brokered ARS.  *Id.* at ¶28.  ARS combine long-term maturity borrowing with interest rates linked to short-term money markets through periodic auctions, which are typically held every 7, 14, 28, or 35 days.  *Id*. at ¶2.  Because of the short intervals between auctions, ARS pay interest rates or dividend yields that are consistent with lower, short-term rates, but typically higher than those paid by treasuries or money markets.  *Id.*  These auctions aim to enable investors to easily liquidate their ARS at the end of each period, and are typically conducted by the same large financial institutions that provide the issuers of the ARS with underwriting services (the "Lead Underwriters").  *Id*. at ¶29.  Financial institutions create and broker ARS based on several types of debt obligations and other assets, including the obligations of municipal governments and pools of federally insured student loans (student loan auction rate securities, known as "SLARS").  *Id.* at ¶30.

In the event that the number of ARS holders selling their securities at an auction outnumbered investors bidding for those instruments, the auction is said to have failed.  Comp. ¶31.  In the event of auction failure, none of the investors holding those ARS can sell their securities and the instruments are illiquid until the next auction.  *Id.*  During this holding period, the ARS pay investors a higher

"penalty rate" or "fail rate" to penalize insurers, compensate investors for the temporary illiquidity, and create new liquidity by inducing new investors to step in to benefit from the higher interest rate.  *Id.*  Fail rates vary depending on the ARS, and are determined by the terms under which the particular security has been issued.  *Id*.  The fail rates for Oppenheimer-brokered ARS, however, were capped at low maximums, rendering those securities less attractive to investors in the event of auction failure.  *Id.* at  ¶38.  This fail rate  was not disclosed to Ashland until after the collapse of the ARS market.  *Id*. at ¶55.

Both the Lead Underwriters and downstream brokers, including Oppenheimer, marketed ARS as beneficial to investors, representing that ARS were as safe and liquid as money-market instruments, but with a slightly higher yield to compensate for the time intervals between auctions.  Compl. ¶29.  Unbeknownst to Ashland, there was often insufficient third-party demand for Oppenheimer-brokered ARS, and Lead Underwriters routinely purchased these ARS, preventing auction failure.  *Id*. at ¶36.  Yet as "Oppenheimer knew, but concealed from Ashland" the Lead Underwriters' commitment to providing liquidity for ARS would extend only as far as the Lead Underwriters deemed providing such liquidity to be in their own best interest.  *Id*. at ¶37.  In fact, the Lead Underwriters had imposed a limit on the amount of ARS that they would purchase for their own inventories. *Id.*

## B.    Auction failures

In early January 2008, Ashland learned that one of the Lead Underwriters,

Goldman Sachs, had allowed an auction for SLARS by student lender First Marblehead to fail.  Compl. ¶59.  Although Ashland did not own any First Marblehead SLARS, it was alarmed by the news of the auction failure, and contacted Sherri L. Castner, Oppenheimer's Executive Director of Investments, to discuss its implications for other Oppenheimer-brokered SLARS.  *Id.*  Castner characterized the First Marblehead failure as an "aberration" and represented that Oppenheimer-brokered ARS remained safe, liquid investments. *Id.* at ¶60.  Castner also continued to aggressively market SLARS to Ashland, who continued to hold the Oppenheimer-brokered SLARS it had purchased and to make additional purchases.  *Id.* at ¶60.

On January 18, 2008, Greg White, the Managing Director of Oppenheimer's Auction Rate Department, sent an email to high-ranking personnel in that department, seeking their assessment of the risks present in Oppenheimer's ARS business.  Compl. ¶63.  In response, the Senior Vice President and supervisor of Oppenheimer's ARS Desk, Louis Gelormino, acknowledged that if a firm through which Oppenheimer was participating in auctions abruptly exited the business, then Oppenheimer would have to quickly find another party to accept their bidding rights and process orders.  *Id.*  Gelormino also noted that if a Lead Underwriter declined to place a proprietary bid to prevent auction failure, then Oppenheimer may not be able to sell shares.  *Id.*  On January 23, 2008, another substantial Lead Underwriter of ARS, Lehman Brothers ("Lehman"), chose not to place a proprietary bid in some

4

auctions, resulting in auction failure.  Compl.  ¶64.  Several days later, another financial firm, Piper Jaffrey ("Piper"), declined to place sufficient proprietary bids and allowed auctions to fail. *Id.* at  ¶ 65.

### 1.    Oppenheimer executives liquidated their personal ARS holdings.

During this time period, several Oppenheimer executives chose to liquidate their personal ARS holdings.  Oppenheimer's Chairman and CEO, Albert Lowenthal, liquidated $2,650,000 worth of his personal ARS holdings between December 1, 2007 and the market's collapse of February 12, 2008; White sold $100,000 worth of ARS in his wife's business account on February 3, 2008, and, following additional Goldman ARS auctions on February 7, 2008, $275,000 of personal ARS holdings from his account; Larry Spaulding, Chief Operating Officer, similarly sold $100,000 of his own ARS holdings on February 7, 2008.  *Id.* at  ¶69, 71, 75, Despite the Goldman auction failure on February 7, 2008, Oppenheimer continued to solicit SLARS and Ashland continued to purchase them.  *Id.* at § ¶76-77.

### 2.    The market's collapse.

On February 11, 2008, Oppenheimer executives met to discuss the ARS market.  At the close of this meeting, "Oppenheimer had concluded that there were particular problems concerning SLARS, such as those sold to Ashland."  *Compl*. at ¶78.  The ARS market imploded the very next day, February 12, 2008.  *Id.* Following the market collapse, Ashland directed Oppenheimer to begin liquidating its Oppenheimer-brokered ARS holdings.  *Id.* at 79.  Castner informed Joseph R.

Broce, Ashland's Assistant Treasurer, that, contrary to Oppenheimer's repeated representations concerning the liquidity of SLARS, Oppenheimer was unable to provide liquidity for any Oppenheimer-brokered SLARS.  *Id.*

At this point, Ashland discovered that with the Lead Underwriters no longer stepping in to provide liquidity, Oppenheimer-brokered SLARS were illiquid due to insufficient third-party demand.  *Id.*  at  ¶80.  As of February 12, 2008, Ashland held more than $194 million of illiquid Oppenheimer-brokered-SLARS.  *Id.*  Ashland has been forced to discount the value of its illiquid SLARS holding by tens of millions of dollars due to the lack of a market for these securities, and to the extent it has been able to make isolated sales of its SLARS, it has incurred millions of dollars of losses in connection with these transactions.  *Id.* at ¶86.  Furthermore, Ashland has been unable to access cash "currently trapped in Oppenheimer-brokered SLARS."  *Id.* at  ¶87.

## II.   Count One: Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

### A.   Standing

Ashland Inc. has standing to pursue fraud claims against Oppenheimer under federal and state law.  Count One of the complaint alleges fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  Rule 10b-5 provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or the mails or of any facility of any national securities exchange,

6

(a) To employ any device, scheme, or artifice to defraud
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in *connection with the purchase or sale of any security.*

17 C.F.R. 240.10b-5 (emphasis added).  Oppenheimer argues that Ashland Inc. lacks standing because it did not purchase the securities in question – rather, AshThree LLC purchased them.  Ashland Inc. counters that it has standing because a parent is considered the *de facto* purchaser of securities actually purchased by a wholly owned subsidiary.

The class of plaintiffs who may maintain a private cause of action for money damages for violations of Rule 10b-5 is "limited to actual purchasers and sellers." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975).  This rule bars three principal classes of plaintiffs: (1) potential purchasers who allege that they decided not to purchase due to an "unduly gloomy representation or the omission of favorable material"; (2) shareholders in the issuer who allege that they did not sell their shares because of "an unduly rosy representation or a failure to disclose unfavorable material"; and (3) shareholders, creditors, and others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5.  *Id.* at 737-38.  This limitation "avoids vexatious litigation by ensuring

7

that the conduct of the parties and the resulting damages are objectively demonstrable." *Grubb v. FDIC*, 868 F.2d 1151, 1161 (10th Cir. 1989).

The "actual purchasers and sellers" requirement is not limited to the literal meaning of that term. For example, one plaintiff had standing where he formed the holding company that purchased the stock in question following the defendant's alleged representation. *Grubb v. FDIC*, 868 F.2d 1151, 1162 (10th Cir. 1989). Although the plaintiff did not personally purchase the stock, he was deemed the "actual purchaser" within the rationale of *Blue Chip* because he executed a promissory note for the loan that financed the stock purchase, he personally guaranteed the holding company's loan, and he suffered a direct injury as a result. *Id.*

The same rationale applied in *United Dept. Stores v. Ernst & Whinney*, 713 F. Supp. 518 (D.R.I. 1989). As in *Grubb*, the individual plaintiffs were not suing for the diminution of their own stock, but rather for the direct injury they suffered as a result of their $500,000 in contributions and their guarantee made in reliance on the defendant's advice. Thus the individual plaintiffs "were the actual parties at risk in the [] transaction to the extent of their direct investment and guaranty of [the note]." *Id.* at 524.

This case is somewhat distinguishable from *Ernst* and *Grubbs* because the purchase at issue was financed purely through a capital contribution as opposed to some sort of loan arrangement. Given the nature of the parent/subsidiary

8

relationship, however, Ashland Inc. constitutes an actual purchaser under the meaning of the statute.  As the parent of a wholly owned subsidiary, Ashland Inc. exercised complete control over AshThree LLC, and any losses AshThree sustained would be reflected in their consolidated financial statements.  Moreover, Ashland Inc. does not fall into any of the three classes of plaintiffs that the Supreme Court sought to preclude in *Blue Chip*.  Ashland Inc. is therefore a purchaser according to Rule 10b-5, and is not barred from pursuing its federal securities fraud claims.

Oppenheimer also argues that AshThree lacks standing because it can simply hold the now-illiquid securities through maturity, at which point it will recoup its investment.  First, this argument ignores Ashland's claim that it has made some "isolated sales" of its Oppenheimer-brokered SLARS, which resulted in a loss.  Compl. ¶86.  It also ignores the fact that Ashland seeks to rescind its Oppenheimer-brokered SLARS purchases.  In some circumstances, plaintiffs in §10(b) cases may opt for rescission in lieu of out-of-pocket damages.  *Randall v. Loftsgaarden*, 478 U.S. 647, 662 (1986); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993).  Thus, the fact that the plaintiffs may eventually recover the original value of their investment (which does not account for interest) does not bar Ashland from pursuing rescission.

**B.    Judicial Notice of Information Outside the Complaint**

Oppenheimer has requested that the court take judicial notice of several documents submitted as exhibits to its motion to dismiss.  R. 41, Ex. A-Q.  These

documents include Ashland's complaint against Morgan Stanley (R. 41, Ex. A);

excerpts from Ashland Inc.'s 2008 Form 10-K, which is a required SEC filing (*id.* at

Ex. B); AshThree's brokerage statements reflecting its SLARS purchases from

Oppenheimer (*id.* at Ex. C); excerpts from disclosure documents for each of the

SLARS listed in the amended complaint (*id.* at Ex. D-O); disclosures available on

Oppenheimer's website at the time of the purchases (*id.* at Ex. P); and a redline

comparison of the original and amended complaint (*id.* at Ex. Q).

Courts may take judicial notice of information "publicly available to

reasonable investors at the time the defendant made the allegedly false

statements." *Beaver Cty. Ret. Bd. v. LCA-Vision, Inc.*, No. 1:07-cv-750, 2009

U.S. Dist. LEXIS 31375 at *13 (S.D. Ohio Mar. 25, 2009). This includes

documents such as SEC filings, prospectuses, and statements "integral to the

complaint." *Id.* (citations omitted). A court may consider any matters of which a

court may take judicial notice without converting a party's motion to dismiss into a

motion for summary judgment. *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F.

Supp. 2d 688, 712 (S.D. Ohio 2006). The court may take judicial notice of these

documents, however, only to the extent that their existence or contents "prove

facts whose accuracy cannot be reasonably questioned." *Id.* (citation omitted).

Moreover, "[a] judicially noticed fact must be one not subject to reasonable dispute

in that it is either (1) generally known within the territorial jurisdiction of the trial

court or (2) capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

Therefore, with the exception of the online ARS disclosure document,[1] the court takes judicial notice of the existence of the attached documents for the limited purpose of recognizing their existence.  The underlying arguments made by the parties, disputed facts, and any inferences one might draw from these materials are not the subject of judicial notice, however.  *See Ramirez v. United Airlines Inc.,* 416 F. Supp. 2d 792 (N.D. Cal. 2005).

### C.    The Heightened Pleading Requirements of Rule 9(b) and the PSLRA

To survive a motion to dismiss, a complaint must state "a plausible claim for relief."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  Plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citation omitted).  Where the facts alleged are merely "consistent with" a defendant's liability, the claim fails to cross the line between "possibility and plausibility of 'entitlement to relief.'"  *Id.* (citation omitted).

The instant lawsuit is also subject to Rule 9(b) of the Federal Rules of Civil Procedure, which requires that claims of fraud be pled with particularity.  Fed. R. Civ. Pro. 9(b).  In addition, the Private Securities Litigation Reform Act ("PSLRA")

---

[1]The court may consider the online ARS disclosure document because it is central to Ashland's claim that it contained material omissions.  *See* Compl. ¶38; *see also Benzon v. Morgan Stanley Distrib., Inc.,* 420 F.3d 598, 603-04 (6th Cir. 2005) (allowing consideration of documents attached to a motion to dismiss because they were central to the claim that those documents contained material omissions and misrepresentations and the other party acknowledged it had relied on them).

imposes more exacting pleading standards that require plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter. U.S.C. § 78u-4(b)(2). With respect to the factual allegations, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1).

### 1.    The Allegations of Fraud Do Not Meet the Particularity Requirements of the PSLRA.

Ashland alleges that Oppenheimer's material misrepresentations and omissions regarding the health of the market for SLARS induced Ashland to participate in that market based on false pretenses.  In May 2007 Broce, Castner, and Oppenheimer's Senior Financial Associate, Lenee C. Firlit, met to discuss investment options for the acquisition principal. Compl. ¶24.  This meeting and followup conversations occurred "in and from" Broce's office in Lexington, Kentucky.  *Id.*  "At this initial meeting, Ashland explicitly described to Oppenheimer its need for safety and liquidity with respect to the [a]cquisition [p]rincipal."  *Id.* Ashland states that during these initial communications, Oppenheimer "marketed itself aggressively" and "touted the high level of investment and cash management expertise and service with which it could provide [Ashland]."  *Id.* at ¶25.  In reliance on these representations, Ashland engaged Oppenheimer to provide

12

"investment and cash management services," and began purchasing Oppenheimer-brokered ARS on June 5, 2007. Compl. ¶27.

Ashland goes on to state that in order to induce Ashland to engage Oppenheimer to provide these services, Castner and others made several material representations concerning ARS. Specifically, Oppenheimer represented that Oppenheimer-brokered ARS (1) were of the highest available quality; (2) were comparable to money markets in terms of safety and liquidity; and (3) offered the ideal investment opportunity for the acquisition principal. Compl. ¶33. At the same time, Ashland alleges, Oppenheimer failed to disclose the true liquidity risks associated with those securities or the extent of Oppenheimer's financial interest in maintaining the ARS market in order to generate fees. Compl. ¶36-38.

Ashland also provides excerpts from a series of emails from Castner to Broce following the Goldman Sachs auction failure in January 2008, in which Castner solicits SLARS purchases. Compl. ¶66-67. Ashland alleges that marketing these securities to Ashland at that point in time constituted a material misrepresentation that the ARS market remained safe and liquid. *Id.* at ¶66-68.

In July 2007, Oppenheimer advised Ashland to refocus its investment strategy from ARS backed by monoline insurers to SLARS. Around that time, Castner represented that "in the event of any disequilibrium, the Lead Underwriters would place proprietary bids to prevent auctions for Oppenheimer-brokered SLARS from failing," and that Oppenheimer "could ensure immediate liquidity for these

13

SLARS because their high quality and FFELP guarantee would attract other investors to purchase those SLARS."  Compl. ¶47.

Ashland's allegations largely fail to identify the specific date or location of the alleged misrepresentations.  At a minimum, a plaintiff must allege the "time, place, and content of the alleged misrepresentation on which he or she relied," in addition to other requirements.  *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (noting that a plaintiff's complaint must "state where and when the [fraudulent] statements were made"); *see also Brightman v. Freeway Assoc.,* No. 90-4072, 1991 U.S. App. LEXIS 19069 at *7 (6th Cir. Aug. 8, 1991) (explaining that plaintiffs in Rule 9(b) cases must relate particular misrepresentation to dates).

Other circuits have also held that plaintiffs failed to comply with the heightened pleading standards of Rule 9(b) by not including sufficient information regarding the time and place of the alleged misrepresentation or omission.  *See Klein v. Autek Corp.,* No. 04-3072, 2005 U.S. App. LEXIS 19155 at *11 (3d. Cir. Sept. 1, 2005) (explaining that references to vague and generic time frames like "at that time" or "in or about February 2000" are insufficient to satisfy Rule 9(b)); *In re Citigroup Auction Rates Securities Litigation*, 2009 WL 2914370 at *5 (noting the plaintiff's failure to include specific allegations regarding which defendants performed what acts at what times and with what effect).  The purpose of this requirement is to give defendants fair notice of the allegations against them so they can prepare an informed pleading responsive to the specific allegations of fraud.

14

*See United States, ex rel. Snapp, Inc. v. Ford Motor Co.,* 532 F.3d 496, 503-04 (6th Cir. 2008).  Although the omission of precise dates is not automatically fatal to the complaint, it ultimately undermines Ashland's allegations by making it difficult to assess whether the statements in question were false or misleading when made and the materiality of any omission.

Ashland alleges that Oppenheimer made several material omissions and misrepresentations regarding the safety and quality of ARS and SLARS.  Ashland alleges that Oppenheimer made false statements regarding the relative quality and liquidity of SLARS compared to other ARS and the nature, credit quality, and risks associated with Oppenheimer-brokered ARS and SLARS.  Compl.¶90(i),(iii),(iv),(vii). With respect to the safety and liquidity of SLARS, Ashland has not pled facts suggesting that these statements were false or misleading when made.  Ashland does not identify the point at which its holdings became illiquid.  Based on the facts alleged, it appears that Ashland's SLARS holdings became illiquid when the market for these securities collapsed on February 12, 2008.  In other words, Ashland does not allege that had it attempted to liquidate its holdings earlier, it would not have been able to do.  That these securities became illiquid does not automatically render Oppenheimer's statements actionable. *Konkol v. Diebold, Inc.,* No. 08-4572, 2009 U.S. App. LEXIS 28194 at *14-15 ("Without specific allegations showing that the Defendants either knew of or recklessly disregarded the falsity of their own statements at the time the statements were made, the fact that their statements

15

later turned out to be false is irrelevant to a cause of action under the PSLRA.").

Similarly, Ashland alleges that Oppenheimer made misleading representations and material omissions regarding the quality of SLARS due to their AAA credit rating. Ashland alleges that Oppenheimer touted this credit rating, yet "knew or should have known that low [fail] rates would negatively impact the liquidity of the SLARS in the event of disruptions in the ARS market." Compl. ¶53. For example, Ashland notes that Oppenheimer's ARS disclosure document, available to customers online, did not disclose the maximum fail rate in the event of auction failure. Compl. ¶38. That same document, however, cautioned that the method for calculating the maximum rate was specified in the offering documents of each security, that such rates varied, and that Oppenheimer could not ensure an auction would clear at a rate favorable to the investor. R. 41, Exh. 18 at 9, 13. Ashland therefore fails to allege with sufficient particularity that Oppenheimer's alleged failure to disclose additional information regarding the maximum fail rate in the online disclosure document constituted a material omission. *See Ley v. Visteon Corp.*, 543 F.3d 801, 803 (6th Cir. 2008). Moreover, Ashland has not alleged with sufficient particularity that Oppenheimer's statements regarding the AAA credit rating were false or misleading when made. Ashland asserts that the AAA ratings associated with Oppenheimer-brokered ARS were achieved "at the expense of" maximum fail rates high enough to ensure liquidity, and that Oppenheimer "knew or should have known that low rates would negatively impact the liquidity of

16

the SLARS in the event of disruptions in the ARS market."  Compl. ¶52-53.

Although Ashland alleges that Oppenheimer touted the AAA credit ratings as

evidence of the safety and liquidity of Oppenheimer-brokered ARS, it has not

identified a particular statement by Oppenheimer similarly equating this credit rating

with liquidity.  *See* 15 U.S.C. §78u-4(b)(1) (stating that a complaint shall "specify

each statement alleged to have been misleading").  Thus Ashland fails to allege

with sufficient particularity that Ashland made material misrepresentations

regarding the AAA credit rating.

Ashland also alleges that Oppenheimer made several material omissions and

false statements regarding the extent of the Lead Underwriters' participation in the

SLARS market.  Specifically, Ashland alleges that Oppenheimer made false

statements regarding how often the Lead Underwriters placed proprietary bids  and

their willingness to continue doing so.  Compl.¶90(ii); 91(ii), (iii).  Ashland also

alleges that Oppenheimer made several material omissions regarding the state of

the market for SLARS, including that sales of Oppenheimer-brokered ARS and

SLARS were outstripping genuine third-party demand, that liquidity existed as a

result of discretionary management by the Lead Underwriters, that the Lead

Underwriters had increased purchases of Oppenheimer-brokered ARS and SLARS to

prevent auction failures, and that the Lead Underwriters were contemplating "when

and how to end their practice of buying unwanted ARS and SLARS."  Compl.

¶91(vi), (vii), (viii), (xi).  Ashland acknowledges, however, that Oppenheimer

17

"represented that the Lead Underwriters and others conducting ARS auctions *had never allowed* an auction to fail, and would c*ontinue* to act to prevent such an occurrence*."* Compl. ¶34 (emphasis added). Moreover, Ashland does not allege that Oppenheimer promised that the Lead Underwriters would continue "in perpetuity" to purchase SLARS in order to ensure successful auctions (R. 41, 20) or that Oppenheimer promised that buyer demand for these securities would continue. Ashland was therefore aware that Lead Underwriters had prevented auction failure in the past, and that such intervention might be necessary in the future. Ashland therefore fails to plead with requisite particularity that Oppenheimer's statements or omissions were false or misleading when made.

Ashland also alleges that Oppenheimer failed to disclose its "significant financial interest" in Ashland's continued purchase and retention of ARS and SLARS, and that the Lead Underwriters would buy Oppenheimer-brokered ARS and SLARS only to the extent that "doing so would be in their own commercial best interests. Compl. ¶91(i),(iv). Ashland does not allege, however, that it was unaware that Oppenheimer received fees for its ARS and SLARS sales, as would any broker. Ashland also does not explain why it would have expected the Lead Underwriters to continue buying such securities if it was not in their commercial best interest, absent an explicit agreement to the contrary.

For these reasons, the complaint does not allege with the required particularity that Oppenheimer made material misrepresentations and/or omissions

in order to induce Ashland to purchase Oppenheimer-brokered ARS and SLARS.

## 2.   Ashland Has Not Alleged Scienter with Sufficient Particularity.

Securities-fraud plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  A "strong inference" must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  "Negligence alone on the part of a defendant cannot support a finding of scienter."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  Recklessness, however, "is a sufficiently culpable state of mind" for liability.  *Konkol*, No. 08-4572, 2009 U.S. App. LEXIS 28194 at *5 (citation omitted).  Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  *Id.* at *6 (citation omitted).

The appropriate inquiry for assessing scienter is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.  *Tellabs*, 551 U.S. at 323.  Courts must apply a three-pronged analysis when considering whether a Section 10(b) complaint gives rise to a strong inference of scienter.  *Id.* at 322-23.  First, the court must accept all factual allegations in the complaint as true.  *Id.* at 322.  Second, the court must view the complaint in its entirety in order

19

to determine whether the facts alleged collectively give rise to a strong inference of scienter.  *Id.* at 322-23.  Third, in evaluating whether the complaint meets the "strong inference standard," the court "must take into account plausible opposing inferences."  *Id.* at 323.

Ashland asserts that the following factors indicate that Oppenheimer acted with scienter: (1) Oppenheimer executives "engaged in insider trading at a suspicious time"; (2) there were discrepancies between internal discussions and external representations regarding SLARS and the ARS market; (3) the Massachusetts Secretary of State has accused Oppenheimer of fraud in connection with ARS; (4) Oppenheimer disregarded the most current factual information regarding the ARS market before making misleading statements about it; and (5) Oppenheimer was guided by self-interest in maintaining the ARS market for the purpose of generating fees for the company and additional compensation for its employees.  R. 42, 28.

### a)      Allegations in support of a strong inference of scienter

### i)      Insider trading

In the complaint, Ashland states that "Oppenheimer executives, who were aware of the spate of auction failures in the ARS market in January 2008, grew so concerned with the looming risks in the ARS market that they began dumping their personal ARS holdings in large number around this time."  Compl. ¶69. Specifically, Ashland notes that: (1) Lowenthal liquidated $2,650,000 of his

personal ARS holdings between December 2007 and the market's collapse on

February 12, 2008; White sold $100,000 of his wife's ARS on February 3, 2008,

and $276,000 of his own ARS holdings on February 7, 2008; and that Spaulding

sold $100,000 of his own ARS holdings on February 7, 2008. Compl. ¶ 69, 71,75.

Insider trading at a suspicious time or in an unusual amount can be probative of

scienter.  *Konkol.,* No. 08-4572, 2009 U.S. App. LEXIS 28194 at *15 (citations

omitted).  However, insider trading is "suspicious only when it is dramatically out of

line with prior trading practices at times calculated to maximize the personal benefit

from undisclosed inside information."  *Id.* (quoting *Zucco Partners, LLC v. Digimarc

Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009)).  Ashland does not provide information

about prior trading practices or the types of ARS sold, nor do the facts indicate that

sales were based on any inside information; rather, Ashland acknowledges that

Spaulding and White's personal sales followed the Goldman Sachs auction failure.

Compl. ¶ 69-75. Thus the more logical inference is that these sales were based on

information in the public domain, not on insider information.

> **ii)** **The divergence between Oppenheimer's internal discussions and external representations regarding SLARS and the ARS market.**

Ashland provides several examples of external representations made by

Oppenheimer that it believes diverge from internal discussions.  Ashland notes that

Lowenthal instructed another Oppenheimer executive "not to inform all

Oppenheimer [financial advisors] of the trouble in the ARS market . . . despite the

21

fact that, beginning no later than 2007, he received a hand delivered memo each day documenting the status of failed ARS auctions." Compl.¶57.  Ashland also cites the testimony of Todd Flaman, an Oppenheimer Senior Vice President, who told the Massachusetts Enforcement Division that "downgrades in monoline insurers were causing increasing noticeable stress on the ARS market by late 2007." *Id.* at ¶56.  According to Ashland, these statements demonstrate Oppenheimer's awareness of problems in the ARS market that conflict with its continued representations to Ashland touting these investments.

With respect to Lowenthal, Ashland vaguely asserts that "Oppenheimer was aware of auction failures and significant disruptions in the ARS market during August of 2007."  Compl. ¶56.  Ashland does not provide any indication of the extent of the ARS failures prior to the Goldman Sachs failure in January 2008 or the extent to which these failures involved SLARS, nor does it detail the content of the memoranda Lowenthal received.  In the absence of this information, it is difficult to assess the implications of Lowenthal's instruction.  With respect to Flaman's statement about stress in the ARS market, as noted by Oppenheimer, this allegation conflates trouble in monoline-insured ARS with the market for SLARS.  According to the complaint, by late 2007 Oppenheimer had already advised Ashland to shift its investments from monoline-insured ARS to SLARS.  Compl. ¶43-45.  Thus Flaman's statement does not conflict with Oppenheimer's external statements at the time.

22

Ashland also attacks Oppenheimer's explanation of the Goldman Sachs auction failure.  Castner called the market failure "an aberration"  attributable to Goldman Sachs's "unorthodox" investment approach.  Compl.¶60.  Castner also "assured Ashland that it would never face similar liquidity problems."  R. 42, 27 (citing to Compl. ¶60).  Shortly thereafter, on January 18, 2008, White sent an email to high-ranking personnel seeking an assessment of the risks present in the ARS market.  Compl. ¶63.  Ashland argues that this email and the responses to it indicate that as early as mid-January – i.e. nearly a month before the ARS market implosion – Oppenheimer was aware of the liquidity dangers associated with auction failures.  *Id*.  Although these two events occurred within a few weeks of one another, Castner's statements preceded Oppenheimer's discussions regarding the risks present in the market.

> ### iii)   That Oppenheimer's continued misrepresentations regarding ARS came close in time to the collapse of the ARS market.

Ashland asserts that "Oppenheimer's continued misrepresentations regarding ARS came close in time to the collapse of the ARS market."  R. 42, 28.  Proximity alone, however, does not support a strong inference of scienter.  *Firdel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004).  Even if proximity were sufficient by itself, Ashland has not shown that the majority of Oppenheimer's statements regarding the liquidity and safety of ARS were made in close proximity to the market's collapse.  Perhaps the best possible example of a misrepresentation close in time to

23

the market's collapse is Castner's statement to Broce in January 2008 that

Oppenheimer-brokered ARS "remained safe, liquid, and suitable investments" for

Ashland.  R. 38, pp. 60.  Here, Ashland has not sufficiently alleged that

Oppenheimer knew or recklessly disregarded information it had before it at the time

Castner made this statement in early January 2008.  That Castner's assurance to

Ashland that "it would never face similar liquidity problems" later proved to be

incorrect does not support a strong inference of scienter.  R. 42, 27.  Rather, "[i]t

is in the very nature of securities markets that even the most exhaustively

researched predictions are fallible . . . fraud by hindsight alone will not sustain a

complaint." *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 22 (2d Cir. 1996)

(citations omitted).

### iv)    The Massachusetts enforcement action

In November 2008, the Enforcement Section of the Office of the Secretary

of the Commonwealth of Massachusetts, Securities Division, filed an administrative

complaint in connection with Oppenheimer's marketing of ARS to investors.

Compl. ¶12.  Ashland argues that the fact that another entity has brought claims

against Oppenheimer for its marketing of ARS is probative of scienter.  R. 42, 28.

"Although a government investigation is not altogether irrelevant to the scienter

analysis, a decision by government agencies to investigate a company is not

sufficient to meet the heightened *Tellabs* standard on its own," or possibly even in

combination with other factors.  *Konkol.,* No. 08-4572, 2009 U.S. App. LEXIS

24

28194 at *13.

> **v)** **Disregard for current factual information about the ARS market before making misleading statements about that market**.

Scienter may be inferred from a conclusion that the defendant knew or reasonably believed that the securities at issue were unsuitable to the investor's needs, misrepresented or failed to disclose this reality, and instead recommended and/or purchased the securities. *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 848 (6th Cir. 2007).   According to Ashland, Oppenheimer "consistently represented SLARS as a highly liquid investment option in total disregard of the actual risks these instruments posed." R. 42, 25.  Specifically, Ashland states that Oppenheimer failed to disclose that the Lead Underwriters had imposed SLARS inventory limits, and that a decision to cease placing proprietary bids for SLARS would severely affect the liquidity of Ashland's SLARS holdings. Compl. ¶51.  Ashland also asserts that Oppenheimer was "well aware of significant problems in the ARS market" more than six months prior to its collapse.  From at least August 2007 on, Albert Lowenthal received "a hand delivered memo each day documenting the status of failed ARS auctions."  Compl. ¶19.  Ashland also asserts that the Lehman Brothers auction failure on January 23, 2008 and the Piper Jaffrey auction failure evidenced significant problems in the ARS market, and that Oppenheimer's continued effort to sell SLARS in the wake of these failures evidences scienter.  Compl. ¶64-66; R. 42, 28.  As noted earlier, Ashland does not

25

specify which auction failures these memos discussed, however.  Thus beyond the failures mentioned in the complaint, it is not clear what other information Oppenheimer was aware of at the time regarding auction failures.

### vi)    Self-interest

Ashland alleges that Oppenheimer was "guided by self-interest in maintaining the ARS market for the purposes of generating fees for the company and additional compensation for its employees."  R. 42, 28.  Simply pleading motive and opportunity, as Ashland has done, is insufficient for showing scienter under the PSLRA.  *Robert N. Clemens Trust*, 485 F.3d at 851-52.  Thus the mere fact that Oppenheimer profited from the sales of ARS is not in and of itself indicative of scienter.

### b) Analysis

Accepting these allegations as true, and considering them collectively, a reasonable person would not deem the inference of scienter at least as strong as any opposing inference.  Ashland has chronicled Oppenheimer's growing awareness of disruptions in the ARS market.  Although it is plausible that Oppenheimer's failure to adequately respond to these disruptions constituted recklessness, this inference is not at least as compelling as the inference that Oppenheimer acted negligently.  *See Tellabs*, 551 U.S. at 323.

Ashland repeatedly asserts that Oppenheimer was aware that the market for SLARS was dependent on the Lead Underwriters, and that it knowingly and/or

26

recklessly continued to induce Ashland to purchase SLARS.  *See, e.g.,* compl. ¶1, 33-39, 46-53.  Ashland notes that Goldman Sachs failed an ARS auction in early 2008, and that Piper Jaffrey and Lehman Brothers failed auctions later that month. *Id.* at ¶59, 64, 65.  Ashland does not identify at what point, however, continuing to invest in this market presented a danger "so obvious that any reasonable man would have known of it."  *In re Goodyear Tire & Rubber Company Secs. Litig.*, 436 F.Supp.2d 873, 902  (explaining that complaint did not support strong inference of scienter where allegations failed to set forth specific facts concerning how or when defendants became aware of the factual information that ultimately discredited their statements); *see also Roberts Clemens Trust.*, 485 F.3d at 847.

### 3.    Dismissal of Ashland's federal securities claims

Because Ashland has not alleged facts or scienter with the requisite particularity, Count One will be dismissed.

## III.    Counts Two and Three: Kentucky State Law Securities Claims

The Kentucky Securities Act's anti-fraud provision is "virtually identical" to its federal counterpart, Section 10(b) and Rule 10b-5 promulgated thereunder.  *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 916-17 (6th Cir. 2007). Accordingly, Ashland's claims under Kentucky state law cannot proceed for the reasons discussed above.

## IV.    Count Four: Common-Law Fraud

"In a Kentucky action for fraud, the party claiming harm must establish six

elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Here, Ashland alleges that Oppenheimer made misrepresentations regarding the "purported liquidity" of Oppenheimer-brokered ARS and SLARS, that these statements were known to be false or were made recklessly, that the statements induced Ashland to purchase these instruments, and that Ashland relied upon these statements to its detriment.  R. 42 at 35-36.

Common-law fraud pleadings are subject to the particularity requirements of Rule 9(b), which require Ashland to allege the "time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendant, and the injury resulting from the fraud." *Coffey V. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (citation omitted)."  Ashland has not met these requirements with respect to Oppenheimer's statements about the safety and liquidity of ARS and SLARS.  In addition, Ashland has not alleged facts indicating that Oppenheimer's statements regarding the liquidity of Oppenheimer-brokered ARS and SLARS were known to be false or were recklessly made.  Moreover, "[a]n actionable 'misrepresentation must relate to a past or present material fact which is likely to affect the conduct of a reasonable man . . .[a] mere statement of opinion or prediction may not be the basis of an action.'" *St.*

28

*Martin v. KFC Corp.*, 935 F.Supp. 898, 909 (W.D. Ky. 1996) (quoting *McHargue v. Fayette Coal & Feed Co.,* 283 S.W.2d 170, 172 (Ky. 1995). Thus Oppenheimer's statements regarding the future liquidity of ARS and SLARS or the impact of auction failures over time cannot sustain a claim for common-law fraud.

### V.    Count Five: Promissory Estoppel

To state a claim of promissory estoppel under Kentucky law, Ashland must plead: (1) a promise was made by Oppenheimer; (2) Ashland reasonably relied on said promise by acting or forbearing to act; (3) at the time it made the promise, Oppenheimer foresaw or expected that Ashland would rely on it; and (4) enforcement of the promise is necessary to avoid an injustice.  Ashland alleges that: (1) Oppenheimer promised that the Oppenheimer-brokered ARS and SLARS sold to Ashland were "safe and liquid"; (2) Oppenheimer and the Lead Underwriters would "ensure the liquidity of Oppenheimer-brokered ARS and SLARS sold to Ashland; and (3) Oppenheimer and the Lead Underwriters had "the intent and the ability to never allow Ashland to be left holding illiquid Oppenheimer-brokered ARS and SLARS."  Compl. ¶111

Ashland's promissory estoppel claim fails because Ashland cannot show that reliance on Oppenheimer's alleged assurances about liquidity was reasonable.  The promise upon which a plaintiff relies must be unambiguous.  Here, it is not clear what Oppenheimer promised to do in order to guarantee the liquidity of Oppenheimer-brokered ARS and SLARS.  Ashland does not allege that Oppenheimer

29

promised that the Lead Underwriters would continue placing proprietary bids forever or that Oppenheimer had the power to enforce such a promise, that it promised to rescind its sales in the event that the securities became illiquid, or that it would take some other course of action in order to ensure liquidity. For a sophisticated investor like Ashland to rely on generic statements about ensuring liquidity, without further details about exactly how this liquidity would be achieved, does not constitute reasonable reliance. Moreover, given the information available to Ashland about the risks of these investments generally, enforcement of any promise about liquidity is not necessary to avoid an injustice.

## VI.   Count Six: Negligent Misrepresentation

Under Kentucky law, in order to sustain a claim for negligent misrepresentation, Ashland must allege that (1) Oppenheimer supplied false information for the guidance of Ashland's business transactions; (2) Oppenheimer supplied the information in the course of its business or in a transaction in which it has a pecuniary interest; (3) Ashland justifiably relied on this information; and (4) Ashland suffered a pecuniary loss. *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004). Here, Ashland alleges that in an effort to guide Ashland in investing the acquisition principal, Oppenheimer provided false information to Ashland concerning the purported liquidity of ARS and SLARS. Compl. ¶117; R. 42 at 37. Ashland contends that Oppenheimer's representations about the liquidity of ARS were false when made "because Oppenheimer knew at

30

all relevant times that its representations concerning the purported 'quality' of Oppenheimer-brokered ARS and the willingness of the Lead Underwriters to place proprietary bids would not and could not ensure the 'liquidity' of Ashland's holdings."  R. 42 at 19 (citing to Compl. ¶33, 34, 36, 37, 46, 50, 51).  Ashland does not allege that its holdings were illiquid until the market's collapse in February 2008, nor has it identified any material representations after that time upon which it relied in purchasing Oppenheimer-brokered ARS and/or SLARS.  Ashland therefore has not alleged facts indicating that statements about liquidity were false when made.  Moreover, because "[a]n action for negligent misrepresentation must be based on an affirmative misstatement," Ashland's allegations regarding material omissions cannot sustain its claim for negligent misrepresentation.  *Stratton v. Am. Bd. of Fam. Med, Inc.,* No. 04-cv-144, 2005 WL 2456173 (E.D. Ky. Oct. 4, 2005).

## VII.    CONCLUSION

Accordingly, **IT IS ORDERED** that Oppenheimer's motion to dismiss, R. 40, 41, is **GRANTED**.  All claims are **DISMISSED WITH PREJUDICE**.

Signed on  February 21, 2010



JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

31